[Civ. No. 4311. Fifth Dist. Aug. 24, 1979.]

In re FREDERICK G., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK G., Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender, and Laurance S. Smith, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Edmund D. McMurray and Wm. George Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN (G. A.), P. J.**—Frederick Joseph G., a minor, aged 17 years, was found to be a person coming within the provisions of Welfare and Institutions Code section 602 in that he was guilty of murder in the second degree (Pen. Code, §§ 187, 189). He was committed to the California Youth Authority and appeals. The central theme of appellant's scenario is that the evidence was insufficient to support the trial court's judgment if the record is evaluated under the proper standard of review.

### FACTS

Detective Singleton testified that on Tuesday, March 14, 1978, at about 8 a.m., he was called to the Union Cemetery in Bakersfield to investigate the murder of Liz Moore. He found the victim lying on her back in a spread-eagle fashion in a crossroads. She had on Levi's which were buttoned but unzipped. There was blood on her head and the pavement below, a laceration on her left ear and an abrasion on the left cheek area. There was also a laceration on the right side of her head above the ear. A black and brown elastic belt was tied around her neck. There were abrasions on her back also. Detective Singleton also testified that there were needle marks on the victim's arms, the ring on her left hand had been smashed and there was an abrasion on her right hand. A curb feeler from an automobile was found next to the victim's body.

At the trial Connie Balderas testified that on the night before the murder (Sunday, Mar. 12) the victim was at her house with someone named Chris, Frank G. (appellant's brother), Lillian Ortiz and appellant. She stated that they partied all afternoon, using heroin, angel dust and marijuana. She stated that they later left and went to El Montecito and La Capa, two bars, with Pete Ramirez. They couldn't get into the bars because Pete wasn't old enough, so they went back to Balderas' house. She testified that she got up at 7:30 the next morning (Monday, Mar. 13) and she and the victim used heroin. She then left for work at a car wash.

After work, she saw the victim on the street. Balderas used heroin, and although she didn't see the victim use it she assumed she did.

Counsel stipulated that expert testimony would establish that blood and bile samples taken from the victim were tested and were found to not contain any traceable quantities of heroin. It was also stipulated that the

expert would testify that it would be improbable that heroin would be completely eliminated from the bloodstream in only eight hours.

Balderas testified that she and the victim left to go to California Park and met Frank, Lillian Ortiz and appellant. They first went to K-Mart and the liquor store, then to Union Cemetery. At the cemetery, Frank G. and Lillian Ortiz had sexual intercourse. Appellant attempted the same with the victim, who later told Balderas he had been unable to accomplish the act. Appellant told her to "shut up" and seemed embarrassed by the victim's statement. The victim and Balderas teased appellant about his inability to perform sexually.

Balderas testified that the victim and Lillian Ortiz got into a fight over Balderas' boyfriend. The fight started when the victim began kidding with Lillian that she had had sexual intercourse with Balderas' boyfriend. The victim took off her belt and hit Lillian with it. Lillian then asked appellant for his belt, and he gave it to her. The two women began fighting with the belts. Balderas got between Liz and Lillian and asked them to stop fighting. Liz tried to get away from the fight by running. Appellant, however, began running after Liz cussing at her. Appellant said he was going "to show this bitch how to run." Appellant lassoed Liz around her neck with the belt he had taken off and given to Lillian. Liz fell to her knees and fought with appellant to get the belt off her neck. Balderas pulled at appellant's hair and tried to pull him away from Liz. Meanwhile, Lillian kicked Liz Moore in the cheek. Liz then fell to the ground on her stomach and stopped fighting. The belt was around her neck with a knot tied in the back. Balderas did not see appellant actually tie a knot around the victim's neck. However, Balderas never saw Lillian in a position to have knotted the belt around Liz Moore's neck. After Liz had fallen to the ground, appellant said "Oh, my God, I've killed her."

Balderas stated that everyone then got in the car and ran over the victim, which turned the body over so she was on her back.

Balderas testified that after the rest of the group left the cemetery she got out of the car and returned. She picked up the victim and twisted the belt around to try to loosen it so as to "help her out."

Several days later, appellant, Frank G. and "Fat Eddie" came to her house to clean the car, but Ms. Balderas refused to let them. Lillian Ortiz, Frank G. and appellant came later to discuss their stories regarding the incident.

Balderas stated she called the police a day or two after the murder and about a month later but didn't tell the officers the truth because she was scared. The first time she told the officer that she believed Lillian Ortiz to be responsible for the murder. On the second occasion she told the police that decedent had "burned" some people over a quantity of heroin and that several days before the homicide appellant and Frank G. had been at Connie's house and had said they would get the victim for that.

When questioned regarding promises made to Balderas while interrogating her, Detective Singleton testified that he told her she wouldn't go to jail if she was not involved in the actual homicide and that if she wanted to leave town the police would assist her. When questioned as to promises made regarding her boyfriend who was incarcerated, Detective Singleton replied: "I told her that at the conclusion, if she wanted to go to Texas, we would send her to Texas if we could and also we would send Benny if she wanted him to go or to assist." Balderas was not given immunity from prosecution for the crime. During the trial she was extended immunity as to her admission about heroin use only.

Detective Singleton contacted Sandra Garcia at juvenile hall. Garcia told him that on Monday, March 13 at about 7 p.m. she was at K-Mart buying paint; she saw the victim with Larry Montez. The victim asked her to go riding with them, but she declined and they left in a white station wagon with two males and two females. Ms. Garcia stated she left K-Mart and went to California Park and sniffed paint and smoked angel dust. The vehicle passed again with the same occupants, and she again declined the victim's offer to go riding. Garcia decided to go to her stepmother's near Union Cemetery. At about 8 or 8:30, as she walked through the cemetery, she saw two females fighting near a vehicle and heard a moan as one fell to the ground. She then saw people get into the car and drive past her and noticed Larry Montez was still driving the vehicle. Detective Singleton took Garcia to the scene where she pointed out the area in which the fight occurred. It was approximately where the body was found.

Detective Singleton subsequently recontacted Garcia, who then indicated that her prior story regarding seeing the victim with Larry Montez was not true. She refused to tell him who was with the victim.

At trial Sandra Garcia testified that she saw the victim at K-Mart at 7:30 on Monday night with a Mexican man but not appellant. She left K-Mart and went to California Park and saw the victim in the same car.

Garcia then went to the cemetery. She said there was enough light for her to see two girls arguing and fighting. One of the females fell. The others got in a car and ran over the body. Ms. Garcia testified that the car was the same one she saw at K-Mart and that the male accompanying the victim looked like Larry Montez. She said that when questioned by Detective Singleton he told her she was lying and appellant was involved, and she refused to talk further as she felt it was futile.

Lillian Ortiz, Frank G. and appellant were arrested for the offense on April 12. Appellant was questioned and denied knowing the victim and denied involvement in the killing. Frank G.'s car was seized and identified by Balderas as the car which was driven on the night of the murder.

Detective Singleton testified at trial that no curb feeler had been found on Frank's car, nor was there any evidence that one had been there.

Detective Singleton also indicated that a lime green, mid-sixties, "low-rider" vehicle with "rocket-type mags" had been suspected and that rubber molding with lime green paint on it had been found at the scene several days after the body had been found.

The defense consisted of alibi testimony and testimony tending to impeach and discredit the prosecution's principal witness, Balderas.

In addition to the testimony of Sandra Garcia regarding the victim's being with Larry Montez just before the murder, appellant called his mother, Veronica G., who testified that she knew appellant was at home all day Sunday because he was there when she left for work and when she called home during the early evening. On Monday, March 13 (the day of the murder), appellant visited the Acostas twice, once at 11:30 a.m. and again around 2 p.m. At about 4 p.m. appellant went with his mother, brother and sister-in-law to look at cars for his brother. He returned with his family and spent the evening of Monday, March 13, at home. On Tuesday, March 14, his mother gave him a check to buy a concert ticket. Veronica testified that the only belt appellant owned was a beige Boy Scout belt.

Margie Acosta confirmed Veronica's testimony as to visits made by appellant to her home. She also testified that the belt involved in the murder was not appellant's.

Rachel Ortiz testified that she saw appellant's brother, Frank G., whom Balderas testified was present when the murder occurred, Saturday and they went to Sammy Garcia's and spent the night. They went riding and then returned to Sammy's. Sunday night they went to the El Morocco Motel and spent the night. On Monday, March 13, they went to see Frances Gonzales and then went to Sammy's. On Monday night, Frances and a man named Raymond stayed with Frank and Ms. Ortiz at the motel.

David Macias, Lillian's boyfriend, testified that he had been with her on Monday because he remembered taking her to the cleaner's on Tuesday and seeing police cars at the cemetery.

Frank G. testified that he registered at the El Morocco Motel on Sunday as John Lopes. A motel registration corroborating his testimony was introduced into evidence.

Arg Rogers testified that she saw the victim on Sunday, March 12, at 11 at her home. She testified that the victim was at her house again on Monday at 12 and left with a guy in a truck. She saw the victim later with another man in a truck. The victim returned at about 2 or 3 p.m. She left at 6 p.m.

Mary Anne Ramos, Mrs. Rogers' granddaughter, testified that she last saw the victim on Monday at 6:15 p.m. She had borrowed a black belt from Ms. Ramos.

Dr. Dominick Ambrosecchia of the coroner's office testified that the cause of death was asphyxiation due to a belt tied around her neck and multiple traumatic injuries. Contrary to Ms. Balderas, Ambrosecchia also testified that the belt could not have been turned from back to front as it was so tight that doing so would have caused abrasions. He saw no evidence that blood had flowed from the victim's nose. He also testified that the marks on the victim's back were not consistent with a car running over her. He thought it was unlikely that the victim's body could have been flipped over by running over it with a car.

Frank Dobesh, Superintendent of Union Cemetery, testified that there are no lights in the cemetery and the closest lights are street lights located about 100 yards outside the cemetery.

Frances Devora testified that the victim and Lillian Ortiz were on extremely bad terms and that she would be very surprised to see them together. In contradiction to Balderas' testimony, Ms. Devora also testified that Frank G. and appellant did not attend services for the victim and that it was Frances' sister, Victoria, who placed a black rose on the coffin. Victoria Devora confirmed this testimony.

When confronted with prior inconsistent statements, Balderas repeatedly did not recall making them or admitted she had made them up. Balderas did not remember having said that "they ran over her first and then strangled her." She denied saying that "[t]hey wanted to rape her after she was dead but they didn't have the guts to." She also stated she lied when she said that she heard Lillian Ortiz say she finished the victim off.

Ms. Balderas testified that before the killing she took a friend who wanted to buy angel dust to meet "Fat Eddie," Frank G. and appellant. Fat Eddie, Frank G. and appellant took the money without giving them any drugs and left for good. Ms. Balderas called her brother and got some grenades and guns together to go after them.

Balderas also testified that she had had a fight with Liz Moore in which she had stabbed her, and a fight with Lillian during which she shot her twice because Lillian had been going out with her boyfriend.

Balderas testified that there were two pole lights at the cemetery. She stated that she lied when she told the police that a "black guy" killed the victim; that appellant was driving; and that everyone had sex with everyone else that night. She also testified that she remembered telling police that blood was coming from the victim's nose but didn't remember if this was true.

By way of rebuttal respondent presented evidence that after appellant had been arrested he and his mother were placed in a room in the Bakersfield Police Department which was equipped with a monitoring device. During the conversation between appellant and his mother, his mother said that they would find out who started all the trouble for appellant and that the person would pay for it. She also said that, "I am going to find out what date they say this girl is supposed to have been killed. That way I can go back and remember, remember where you were. [¶] I know you were home."

## DISCUSSION

Preliminarily we note that most of appellant's brief consists of a scholarly discourse on the constitutionality of depriving appellant of a jury trial and of the substantial evidence rule as he perceives it.

■ Adverting first to the jury trial discourse, it is settled as of now that ". . . neither the state nor the federal Constitution guarantees a jury trial in a juvenile proceeding." (*People* v. *Superior Court (Carl W.)* (1975) 15 Cal.3d 271, 274 [124 Cal.Rptr. 47, 539 P.2d 807]; *In re Roger S.* (1977) 19 Cal.3d 921, 938 [141 Cal.Rptr. 298, 569 P.2d 1286]; *Richard M.* v. *Superior Court* (1971) 4 Cal.3d 370, 376 [93 Cal.Rptr. 752, 482 P.2d 664]; *In re Daedler* (1924) 194 Cal. 320, 332 [228 P. 467]; *McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528, 545 [29 L.Ed.2d 647, 660-661, 91 S.Ct. 1976].) We are bound by these decisions. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Turning next to the substantial evidence rule, it is undoubtedly true that there have been some misquotations and misapplication of the rule as well as distortions of it by the quotation of selected parts to fit the factual situations in particular cases. Nevertheless, the true scope and import of the rule has been made clear by leading Supreme Court decisions. Because considerable argument has been devoted to the subject by the parties, it is necessary to quote at some length from leading California cases on the subject before proceeding to a consideration of whether the California standard of review has been changed by the recent United States Supreme Court case of *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].

■ The leading case in this area is *People* v. *Redmond* (1969) 71 Cal.2d 745, 755-756 [79 Cal.Rptr. 529, 457 P.2d 321], which instructs: "This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.]

■ "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.] Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. [Citations.]

■ "In *People* v. *Bassett*, 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777], we recently pointed out that, in considering the sufficiency of evidence purporting to connect the defendant with the crime, *'the appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt* [citations]. The prosecution's burden is a heavy one: "To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence." [Citation.] Accordingly, in determining whether the record is sufficient in this respect the appellate court can give credit only to "substantial" evidence, i.e., evidence that reasonably inspires confidence and is "of solid value." ' As *Bassett* points out, this rule has also been applied in numerous cases involving the sufficiency of evidence as to matters other than identification. [Citation.]" (Italics added.) *Redmond* has been cited and all or parts of its language has been repeated in substance in numerous subsequent cases. (See *People* v. *Reyes* (1974) 12 Cal.3d 486, 496-497 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824]; *People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887]; *People* v. *Kunkin* (1973) 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199]; *In re Roderick P.* (1972) 7 Cal.3d 801, 808-809 [103 Cal.Rptr. 425, 500 P.2d 1]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

*Reyes* and *Kunkin* require particular note. In *Reyes* the court equated the substantial evidence rule with the standard of " 'a reasonable trier of fact' " determining whether the " '. . . prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " The court stated: "There is merit to Venegas' contention that the evidence adduced at trial is insufficient to support the judgment rendered against him. In reviewing a criminal conviction, an 'appellate court *must determine whether a reasonable trier of fact could have found the prosecution sustained*

*its burden of proving the defendant guilty beyond a reasonable doubt.'* [Citations.] The substantial evidence rule is our yardstick for determining whether a verdict meets this minimal standard of reasonableness: 'The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.' [Citations.] To be considered substantial, evidence must be of the type which 'reasonably inspires confidence and is "of solid value." ' [Citation.]" (*People* v. *Reyes, supra,* 12 Cal.3d at pp. 496-497.) (Italics added.)

In *Kunkin,* after reciting the substance of the rule, the court states: "The substantial evidence rule mandates consideration of the weight of the evidence before deferring to the conclusions drawn from the evidence by the trier of fact." (*People* v. *Kunkin, supra,* 9 Cal.3d at p. 250.)

Implicit in the appellate court's duty to consider the weight of the evidence and to determine " '. . . whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt' " (*People* v. *Reyes, supra,* 12 Cal.3d at p. 496) is the obligation to review the whole record. In no other way can the court determine whether evidence merely raises a suspicion of defendant's guilt or reasonably inspires confidence and is of solid value. If the court did not review the whole record it would be faithless to its duty under the rule. Accordingly, appellant's contentions that the substantial evidence rule in California does not require the appellate court to look at the whole record and that its duty is satisfied upon the discovery of *any evidence* to support the verdict are without merit.

In *In re Roderick P., supra,* 7 Cal.3d 801, 808-809, the substantial evidence rule as articulated in *Redmond, supra,* was held applicable to juvenile court proceedings.

It remains to determine whether under *Jackson* v. *Virginia, supra,* 443 U.S. 307 [61 L.Ed. 560, 99 S.Ct. 2781] a more stringent standard is required by the United States Constitution.[1] *Jackson* was a federal habeas corpus proceeding in which the federal Court of Appeals had applied the "no-evidence" criteria of *Thompson* v. *Louisville* (1960) 362 U.S. 199 [4 L.Ed.2d 654, 80 S.Ct. 624, 80 A.L.R.2d 1355] to a state conviction of murder and denied the writ. In *Thompson* v. *Louisville, supra,* the court

---

[1]The respondent concedes that the standard of *Jackson* is binding on the California courts.

held that the writ should be denied if there was *any* evidence to support a state court conviction.

The *Jackson* court held that as a matter of due process the standard for evaluating the sufficiency of evidence is whether any rational trier of fact could find guilt beyond a reasonable doubt, stating: "But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' *Woodby* v. *INS,* 385 U.S. 276, 282 [17 L.Ed.2d 362, 87 S.Ct. 483, 486]. Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson* v. *Louisiana,* 406 U.S. 356, 362 [33 L.Ed.2d 152, 92 S.Ct. 1620]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.¹³" (*Jackson* v. *Virginia, supra,* 443 U.S. 307 [61 L.Ed.2d 560 at p. 573-574, 99 S.Ct. at pp. 2789-2790]; fn. 12 omitted.) In footnote 13 the court further elaborates: "The question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder —if known. See generally 3 Wharton's Criminal Procedure § 520 (1975 and Supp. 1978)." 443 U.S. at pp. 319-320 [61 L.Ed.2d at p. 574, 99 S.Ct. at p. 2790.]

The language in *Jackson* is so close to that used in *Redmond* and subsequent cases as to be indistinguishable in impact or application. The only semantic difference is that the United States Supreme Court in *Jackson* used the word "rational" in its formulation, whereas the California Supreme Court has used the word "reasonable." The words are synonymous. (Webster's New World Dict. (2d college ed. 1972) pp. 1179, 1183.) Accordingly, we hold the California substantial evidence test has not been changed by *Jackson* and that it comports with due process of law.

■ Applying the foregoing test to the facts of the instant case, we are impelled to conclude that upon examination of the whole record the evidence was sufficient to support the juvenile judge's determination that appellant violated Penal Code section 187 and in concluding it was murder in the second degree (Pen. Code, § 189).

Balderas' sworn statements at trial amount to eyewitness testimony that appellant committed the offense at hand. The testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions. (Evid. Code, § 411;[2] *People* v. *Robinson* (1964) 61 Cal.2d 373, 389 [38 Cal.Rptr. 890, 392 P.2d 970]; *People* v. *Matlock* (1959) 51 Cal.2d 682, 695 [336 P.2d 505]; *People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 574-577 [156 Cal.Rptr. 630].)

While Balderas admits she did not actually see appellant knot the belt around the victim's neck she did observe appellant to lasso the victim around the neck with a belt. She observed them struggling and the victim falling to her knees. Balderas was in back of appellant while he and the victim struggled when the victim attempted to get the belt off from around her neck. She observed the victim fall to the ground and cease struggling. Appellant stood up and said, "like he was crying," "Oh, my God, I've killed her." Balderas saw that the belt had been tied around the victim's neck and knotted in the back. Balderas did not observe anyone else in a position to have been able to contribute to the strangulation of the victim. Moreover, his oversensitive sexual macho had been sullied by the victim's stinging remarks in the presence of the others regarding his inability to have sexual intercourse. Sandra Garcia corroborated that there was sufficient light to see and that the car subsequently ran over the victim's body and at one point two women were fighting.

The testimony of Balderas constitutes substantial evidence to support appellant's conviction.

The thrust of appellant's argument, both below and in this court, is directed toward discrediting the testimony of Balderas. Appellant urges that as a matter of law it does not reasonably inspire confidence and is not of solid value. In doing so he impliedly implores this court to independently determine from the whole record whether the evidence was sufficient to conclude that appellant is guilty beyond a reasonable doubt.

---

[2]Evidence Code section 411 provides: "Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact."

As heretofore explained, this goes beyond our duty, it being limited to determining whether there is sufficient evidence upon which a reasonable trier of fact could have found the prosecution sustained its burden of proving defendant guilty beyond a reasonable doubt. It is not our function to reweigh the evidence, reappraise the credibility of witnesses or redetermine factual conflicts, those functions being within the province of the trier of fact. (*People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887]; *People* v. *DePaula* (1954) 43 Cal.2d 643, 649 [276 P.2d 600]; *People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758] (disapproved on other grounds in *People* v. *Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433]).) The limitation in this regard is that the appellate court will not uphold a verdict based upon evidence which is inherently improbable and thus may reject evidence believed by the trier of fact if there exists either a physical impossibility that it is true or the falsity of the evidence is apparent without resorting to inference or deduction. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 150 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Huston, supra,* 21 Cal.2d 690, 693.) There is nothing in this record rendering Balderas' version inherently improbable, physically impossible or legally unbelievable.

Appellant argues that her testimony could not be considered substantial evidence because: (1) she was an accomplice whose testimony must be viewed with distrust; (2) because of the promise of immunity she had an interest in testifying against appellant; (3) at the time of the events she observed she was under the influence of drugs; and (4) the contradictions inherent in her testimony and between her testimony and other evidence in the case makes her entire testimony unbelievable.

■ The rule requiring corroboration of an accomplice's testimony (see Pen. Code, § 1111) is not applicable in a juvenile court proceeding. (*In re Mitchell P.* (1978) 22 Cal.3d 946 [151 Cal.Rptr. 330, 587 P.2d 1144].) ■ Moreover, Balderas was not technically an accomplice in this case. An accomplice is one "who is liable to prosecution for the identical offense charged against the defendant. . . ." (Pen. Code, § 1111.) There is no evidence to suggest that Balderas aided appellant in the commission of the offense.

Contrary to appellant's statement, Balderas did not testify under a promise of immunity from prosecution for the crime but during trial was given immunity with respect to her testimony regarding her use of drugs. Whatever bias she had as a result of favors she was offered in return for her testimony or her own personal interest in the outcome, like her use of

drugs before the murder, merely goes to her credibility and does not render her testimony unbelievable as a matter of law.

Lastly, appellant points to numerous contradictions of and internal inconsistencies in her testimony. The principal conflicts are: Sandra Garcia testified that she only saw two women arguing and fighting. Also contrary to Balderas' testimony, appellant's mother testified that she was with appellant on the night of the murder. Rachel Ortiz and Frank G. both testified that Frank G., whom Balderas testified was at the cemetery when the victim was killed, was elsewhere on the evening of the murder. David Macias testified that Lillian was with him Monday.

The testimony of the pathologist was inconsistent with some parts of Balderas' testimony. Balderas testified that they ran over the victim's body with the car. The pathologist testified that marks on the victim's body were not consistent with having been run over by a vehicle. However, this aspect of appellant's testimony was confirmed by Ms. Garcia, who testified that whoever did the killing ran over the body. Balderas also testified that as a result of running over the body it was turned. The pathologist testified that running over a body was unlikely to result in its turning. Balderas further testified that she went back after the incident and twisted the belt around. The pathologist testified that such an action would have caused abrasions which were not present on the body. Balderas testified that she observed blood come from the victim's nose. An expert testified that no trauma to the nose was observed during the autopsy.

Balderas testified that the victim used heroin on the morning of the murder. An expert testified that it was unlikely that such narcotics could be flushed from the bloodstream in only eight hours. However, the victim's mother testified that she last saw the victim at 6 o'clock that evening. That was well over the eight-hour period covered by the stipulation. Therefore, this does not constitute an actual contradiction. Balderas testified that appellant used his belt to strangle the victim. Margie Acosta testified the belt used to strangle the victim was not appellant's. Balderas testified that there were pole lights in the cemetery. In fact, no such lights existed. Nevertheless, there were lights 100 yards away, which were sufficient for Sandra Garcia to be able to see what occurred from a distance.

Lastly, Balderas admitted that she gave prior false statements to police as to what happened on the night of the murder.

The above contradictions relate primarily to events which occurred either before or after the actual murder. They are independent of and separable from the version of events testified to by Balderas which constituted the substantial eyewitness testimony against appellant. Those contradictions do not render her testimony impossible or unbelievable but only create a conflict in the testimony and go to Balderas' credibility, which is for the trial court to evaluate. The version given by Balderas is not inherently improbable or impossible, and the court's determination to accept it is sustainable on appeal.

The judgment is affirmed.

Franson, J., and Zenovich, J., concurred.

A petition for a rehearing was denied September 6, 1979, and appellant's petition for a hearing by the Supreme Court was denied October 18, 1979.