Filed 7/26/24  In re A.E. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re A.E., a Person Coming Under the Juvenile Court Law. | D083348 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Q.E.,<br><br>Defendant and Appellant. | (Super. Ct. No. EJ004871) |

APPEAL from an order of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Q.E. (Father) appeals from the juvenile court's jurisdictional order under Welfare and Institutions Code[1] section 300, subdivision (a), which resulted in the removal of six-year-old A.E. from his custody and exit orders granting full legal and physical custody to C.M. (Mother). Father contends insufficient evidence supports the court's finding he inflicted the injuries described in the dependency petition, and that there was no substantial risk of future harm to A.E. Pointing to inconsistencies in A.E.'s statements and other evidence, Father argues someone else inflicted the injuries while A.E. was in Mother's custody. We affirm.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Dependency Petition and Detention*

A.E. was born in August 2017. Father entered his life two years later following the entry of a paternity judgment in 2019. A.E. then spent four nights per week with Father at paternal grandparents' home and three nights per week with Mother and his maternal half-brother at Mother's home. Relevant here, A.E. was in Father's custody from Friday afternoon, April 28, 2023[3] until Father dropped him off at school on Tuesday morning,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] We agree with the parties that Father's appeal is not rendered moot by the juvenile court's termination of jurisdiction. (See *In re D.P.* (2023) 14 Cal.5th 266, 285–287; see also § 362.4 [custody and visitation orders issued by the juvenile court on its own motion remain in effect until modified or terminated by a subsequent order of the superior court].)

[3] All further dates refer to 2023 unless noted otherwise.

May 2.  Mother picked him up from school that afternoon, and A.E. was scheduled to return to Father's custody after school on Friday, May 5.

On Wednesday, May 3, the Child Abuse Hotline received a report that then five-year-old A.E. had disclosed Father gave him "whoppings" with a belt that left marks, including a small healing scab on his hand observed by the reporter.  According to the Agency's detention report, "[t]here was an incident on Monday [May 1] in which the father hit [A.E.] with a belt and left belt marks on [A.E.'s] thigh, butt, and hand.  The mother observed the marks on Tuesday [May 2] and pictures were taken."

During his weekly therapy session on May 3, A.E. disclosed Father "whopped" him and showed the therapist a resulting scar on his wrist.  When the therapist asked to hear more, A.E. responded, "You don't want to hear about that" and would only say the "whooping[ ]s" happened at Father's house.  Mother was not present when A.E. made the disclosure.  When the therapist spoke with her at the end of the session, Mother said she was aware of A.E.'s injuries and had taken photographs.  She had taken A.E. to see a doctor for suspected abuse, but according to her, "nothing happen[ed]" as a result of her report.  The therapist also reached out to Father, who did not respond to her calls.

On May 4, a social worker interviewed A.E. at school.  A.E. refused to speak with the social worker until he called Mother, who encouraged him to do so while on speakerphone.  A.E. allowed the social worker to take photographs of injuries on his left inside wrist and his back, but he did not want to show them injuries he had on other parts of his body.  When the worker asked in which house the injuries occurred, he replied, "You know."

The social worker also interviewed Mother on May 4.  After she picked A.E. up from school on May 2, Mother noticed he had red marks on his

buttocks and legs, and A.E. told her, "[M]y dad hit me with a belt." Mother took photographs at 3:37 p.m. on May 2 showing red markings on A.E.'s bare buttocks, back, and thighs.

Mother denied using physical discipline in her home and suspected A.E. was being physically abused while he was in Father's care. She had taken A.E. to the emergency room on previous occasions but was told it was "not abuse," and she would have to return A.E. to Father. A.E. was scheduled to return to Father's custody on May 5, but Mother agreed to seek a temporary restraining order and take A.E. to Chadwick Center for Children and Families at Rady Children's Hospital (Chadwick) for a physical abuse exam.

On May 5, child abuse expert Dr. Natalie Laub examined A.E. and observed he was "covered in marks." She specifically noted semi-circular hyperpigmented marks on his right thigh, hyperpigmented loop marks on his left thigh and interior left wrist, an amorphous hyperpigmented area on his left buttock, amorphous hyperpigmented marks on his lower back, and a small, scabbed area near the thumb of his left hand. Dr. Laub concluded the marks were "diagnostic of physical abuse" and also noted Mother had brought A.E. to Chadwick on four prior occasions with concerns of abuse by Father, but a forensic interview had not been conducted despite two prior recommendations. Expressing her "significant concerns for [A.E.'s] safety and wellbeing," Dr. Laub again recommended a forensic interview.

On May 8, A.E. underwent a forensic interview at Chadwick. According to the forensic interviewer's report, A.E. disclosed "something ha[d] happened" at Father's house and that he gets "whoopings" with a "[b]lack belt and a white charger." He said it hurts when he gets "whoopings," but he "did not provide further details regarding marks found on his body during the

medical exam." When the interviewer asked him what happened the last time he saw Father, A.E. said Father gave him a "whooping" on his "bottom/butt."

The Agency's detention report includes additional details of the May 8 forensic interview: "[A.E.] said the dad keeps the belt in his closet. [A.E.] denied anyone else using physical discipline. When asked what part of his body, [A.E.] said, 'I don't know.' He said he could not remember then said 'you don't want to know.' [A.E.] denied receiving any marks or bruises when his father whoops him. When [the forensic interviewer] asked [A.E.] about the injuries seen by the doctor during the medical exam, [A.E.] said, 'You don't want to know.' [A.E.] did not disclose how he received the recent markings on his body. He did not want to show the markings to the interview[er]. [A.E.] said he feels 'angry' when he is whopped. He said when he is whopped; he does not tell his dad his feelings. When asked if he felt safe with his dad, [A.E.] said 'no' but he feels safe with his mom."

On May 8, Mother and the social worker created a safety plan whereby Mother would not allow A.E. to return to Father's custody and would seek a restraining order and an emergency custody order from the family court.

After multiple, unsuccessful attempts to reach Father, the social worker interviewed him on May 26. He denied using physical discipline and inflicting the marks observed on A.E. Father asserted Mother had "a history of claiming he is physically abusing [A.E.] when it is actually occurring at her home," and he suspected Mother's boyfriend was abusing A.E. Father had begun taking videos of A.E. to document that he returned A.E. to Mother's custody without any "new" marks or bruises.

Father showed the social worker two videos. The first video, time stamped at 7:18 p.m. on April 28, showed a mark on A.E.'s left wrist and

markings on his inner thighs. The second video, time stamped at 8:10 a.m. on May 2, showed A.E. slowly turning around while completely naked to reveal a marking on A.E.'s left wrist, which Father noted had been there for a while and had also appeared in his April 28 video. According to Father, A.E. arrived at school at 8:45 a.m. on May 2 and had he "whopped" him that morning, the marks would have shown up in his video, A.E. would have complained while at school, or the school staff would have noticed something was wrong.

On June 12, Father contacted the social worker and asserted Mother's boyfriend J.E., whom A.E. also referred to as "dad," was the one hurting A.E.

On June 30, the social worker interviewed A.E.'s paternal grandfather. He denied that Father or anyone else in their home used physical discipline. He shared Father's concerns that A.E. was being abused at Mother's home and reported Mother had "called CPS on [Father] so many times." To "keep the mother from being allowed to railroad the father in Family Court and get full custody of [A.E.]," they perform a complete body check when A.E. arrives and leaves their home and "document" it with photographs and videos.

That same day, the social worker made an unannounced visit to Mother's home and performed a full body check of A.E., which did not reveal any marks or bruises. A.E.'s older half-brother, A.M., denied Mother had a boyfriend or a male friend who came over and denied anyone else was living in the home. Mother reported she had not had any contact with J.E. since 2020, and the worker did not observe any adult male clothing or personal grooming items in the home. The worker left two voicemail messages for J.E., but he did not respond.

The social worker also spoke with Dr. Laub on June 30. Dr. Laub explained the acute markings she had observed on May 5 could show up

within minutes of A.E. being injured and up to one hour later. She further explained the marks would have shown up on the video if A.E. had been disciplined before the video was taken, or the injuries could have been inflicted after the video was taken or when A.E. was home with Mother. Dr. Laub also remarked, "[I]t is important to remember that [A.E.] has been consistently stating that his father whoops him with a belt and a charger cord."

On July 3, the San Diego Health and Human Services Agency (Agency) filed a dependency petition pursuant to section 300, subdivision (a) alleging: "On or about May 5, 2023, the child was diagnosed with having multiple hyperpigmented marks throughout his body, including on his thighs, wrist and hand which the child abuse expert has deemed are diagnostic of physical abuse. The child has provided disclosures consistent with the perpetrator of such abuse being [Father] whom the child states has 'whopped' him with a belt and phone charger. [Father] denies the allegations and the child's mother has been unable to protect the child despite her efforts. Therefore, court intervention is required as there is substantial risk that the child will continue to suffer serious physical harm inflicted non-accidentally." On July 5, the juvenile court found the Agency made a prima facie showing the allegations were true and detained A.E. with Mother and ordered liberal, supervised visitation with Father.

## II.

### *Contested Jurisdiction/Disposition Hearing*

The contested jurisdiction/disposition hearing was held on October 27. The juvenile court received into evidence, over Father's objections, the Agency's various reports. Before addressing Father's testimony, we

summarize additional evidence gathered by the Agency in advance of the hearing.

The Agency interviewed A.E. in July, August, September, and October. A.E. reported feeling safe at Mother's house, but he did not feel safe at Father's house. When the social worker asked A.E. about his visits with Father, he said he felt "fun."

When a newly assigned social worker asked A.E. about his "owwies" in July, he first said he didn't have any, and then said he did but did not know how he got them. When the worker asked him what happens when he is in trouble, he responded, "[D]ad does everything to me" and then said, "I do not know, maybe owwies I guess, yeah, yeah." Later in the interview, A.E. denied that either Mother or Father spanked him and denied having any "owwies" in the past.

In August and October, A.E. again denied Mother spanked him, but during his September interview, he disclosed Mother used to give him "whoopings" when he had "bad days" in kindergarten. He explained Mother only used her open hand and never left a mark or a bruise and insisted, "She doesn't do it anymore. Only in kindergarten." When the social worker reached out to A.E.'s therapist after this disclosure, she said A.E. had disclosed Mother used "whoopings" in the past, but he described them as "yelling" and "never said anything about spankings."

Father maintained Mother's boyfriend J.E. inflicted the marks observed on A.E. and continued to refer to him as "the other father" although A.E. had denied calling anyone other than Father "dad, daddy, papa, pop, or father." Father reported A.E. had previously told him J.E. punched him in the face and choked him, similar to alleged abuse inflicted on A.E.'s older brother, and, more recently, A.E. disclosed J.E. punched him in the face,

leaving a mark on his eye that Father observed on June 9.[4] A.E. had also told Father that both J.E. and Mother "whooped" him because he clogged up the toilet.

A.E.'s paternal grandparents also continued to deny that A.E. was abused in their home, and they asserted Mother was lying and coaching A.E. to say things that were not true. The grandfather reported that A.E. had disclosed that both Mother and J.E. "whooped" him, and Mother had also admitted to spanking A.E.

In its assessments, the Agency noted Father "made minimal to no effort to visit with the [A.E.]" and "ha[d] not seen the child since the initial investigation." Mother, on the other hand, had demonstrated her ability to meet A.E.'s needs. The Agency had not seen any evidence of Mother coaching A.E. It also noted A.E.'s story had been "generally consistent as to the 'whoopings'" and the child abuse expert had provided an explanation for the marks and bruises not appearing on Father's video. During the months that A.E. was solely in Mother's care, A.E. had not reported any physical discipline and had not sustained any new concerning marks or injuries. Multiple collateral contacts, including A.E.'s therapist, teacher, school counselor, and babysitter, expressed having no concerns about Mother.

---

[4] The Agency's reports do not reflect a communication from Father about his observation of a fading mark on A.E.'s eye on June 9, but the July 5 detention report refers to a mark on the A.E.'s eye relative to a 2022 "inconclusive" child welfare services referral alleging physical abuse by Father. Additional referral history involving physical abuse of A.E. includes an unfounded allegation of physical abuse by an unknown perpetrator in 2019, an inconclusive referral for alleged physical abuse of the A.E. and his sibling by J.E. in 2020, and two additional allegations of physical abuse by Father in 2022 that were inconclusive or evaluated out.

Mother continued to take A.E. to weekly therapy sessions, which the Agency observed would subject her to ongoing community oversight.

The Agency recommended the juvenile court find the allegations in the petition true and find A.E. to be a dependent child under section 300 (a). It also recommended removal of A.E. from Father's custody, termination of juvenile court jurisdiction with custody orders awarding Mother full custody and supervised contact with Father until Father could adequately address the protective issues.

At the hearing, Father testified on his own behalf. Father had observed "marks, bruises, scars, welt marks, et cetera" in the past, but Mother "would never seek . . . medical care." He also testified A.E. would come over to his house hungry and dressed in dirty clothes. Father denied inflicting the alleged injuries and maintained the "main perpetrator" was unknown. He asserted the Agency's reports regarding markings from a belt and a charger were "unfounded" and had provided the social worker with "document[ation] that [A.E.] . . . came over with certain marks . . . on Friday, [April 28]."

The juvenile court found the allegations in the dependency petition true by a preponderance of the evidence and declared A.E. to be a dependent of the court under section 300, subdivision (a). The court further found, by clear and convincing evidence, there was a danger to A.E.'s physical health or emotional well-being and his removal from Father was appropriate under section 361, subdivision (c)(1). In making its ruling, the court explained it relied on the Agency's reports, including the reports from the medical providers and A.E.'s statements. It recognized A.E. was six years old and that Father had raised apparent inconsistencies in A.E.'s statements but concluded A.E.'s statements "went back to the minor indicating that he was

10

hit or struck by the father or whooped by the father, or at least in one quote, [A.E.] said, 'My dad hit me with the belt.' "

As to its dispositional order, the juvenile court noted there had been no evidence of injuries or bruising since A.E. had been placed with Mother and out of Father's care. The court signed the proposed custody and visitation order granting Mother full legal and physical custody of A.E. and permitting supervised visitation with Father, adopted the Agency's remaining recommendations, and terminated the juvenile court's jurisdiction. (See § 362.4.)

### DISCUSSION

Section 300, subdivision (a), authorizes the juvenile court to assert dependency jurisdiction when, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Sitting as the trier of fact, the court asserts dependency jurisdiction over a child if it finds the allegations of harm true by a preponderance of the evidence (§§ 300, 355).

The juvenile court's orders are presumed to be correct, and it is appellant's burden on appeal to affirmatively show error. (See *In re J.F.* (2019) 39 Cal.App.5th 70, 79.) "In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court [and] review the record in the light most favorable to the court's determinations." (*In re R.T.* (2017) 3 Cal.5th 622, 633 [cleaned up].)

11

"We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re L.O.* (2021) 67 Cal.App.5th 227, 238.) We defer to the juvenile court's credibility determinations because the juvenile court, as the trier of fact, "is in a superior position to observe the demeanor of witnesses." (*In re George T.* (2004) 33 Cal.4th 620, 634.) Any conflicts in the evidence must be resolved in favor of the prevailing party, and where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) If a juvenile court's finding is supported by substantial evidence, we must affirm, even if other evidence supports a contrary finding. (*Ibid.*) " 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394, abrogated on other grounds in *In re R.T.*, *supra*, 3 Cal.5th at p. 628.)

Applying these well settled principles, we conclude substantial evidence supports the juvenile court's jurisdictional order. Father has not met his burden on appeal to show there is *no evidence* that is " 'reasonable, credible, and of solid value' " from which a reasonable trier of fact could find that Father inflicted the injuries on A.E. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

Unlike criminal proceedings, where the burden of proof is beyond a reasonable doubt and " 'where establishing the identity of the perpetrator is paramount, the purpose of dependency proceedings [is] to fashion appropriate orders in the best interests of the child' . . . [and] "to provide maximum safety and protection" for currently abused and neglected children and to ensure the safety of children at risk of harm." (*In re A.S.* (2011) 202 Cal.App.4th 237,

12

245–246, overruled in part on other grounds in *In re Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) In finding the allegations of the petition true by a preponderance of the evidence, the juvenile court credited A.E.'s statements that Father had "whooped" him with a "belt" and the statements of the medical providers, as it was entitled to do. On appeal, Father does not challenge the juvenile court's admission of A.E.'s statements (see § 355 [hearsay exception for statements made by a child under the age of 12]) and the statements of the medical providers stand uncontroverted.

Father contends "A.E. never stated that [F]ather caused the injuries during his medical examination," "[t]here was ample evidence that both [M]other and [F]ather had given the child 'whoopings'," and claims his video definitively established A.E. had no visible injuries at the end of [his] May 2, 2023 visit [with Father]." Father's arguments overlook the governing standard of review. On appeal, "we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53, overruled on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.) "[I]t is not our function to reweigh the evidence, reappraise the credibility of witnesses or redetermine factual conflicts." (*In re Frederick* (1979) 96 Cal.App.3d 353, 367.) Father improperly asks us to do just that by highlighting other evidence in the Agency's reports he believes is exculpatory while disregarding the evidence that supports the juvenile court's order.

Father acknowledges A.E. had disclosed he gave him "whoopings" with a "belt" and "white phone charger" during his forensic interview on May 8, but points to portions of the Agency's summary of the interview stating A.E. "did not know what part of his body was hit," "did not disclose how he

13

received the recent markings on his body," and "denied receiving any marks or bruises when his father whoops him." Father ignores the forensic interviewer's statement that A.E. "did not provide *further details* regarding marks found on his body during the medical exam" (italics added), and A.E.'s specific statement that he "got a 'whopping' on his 'bottom/butt' from his father" the last time he saw him. Father similarly ignores A.E.'s May 3 disclosure to his therapist that he was "whooped" in Father's home and the May 3 referral to the Child Abuse Hotline in which A.E. reported "[F]ather would hit him with a belt and . . . leave marks." Instead, Father points to A.E.'s disclosure to the social worker in September that he also received "whoopings" from Mother and disregards A.E.'s explanation that Mother had only spanked him with an open hand and never left a mark or a bruise.

Father also references his parents' statements that he did not physically abuse A.E. and two child welfare referrals in 2018, before he was involved in A.E.'s life, that involved allegations of physical abuse of A.E.'s older half-brother by Mother to support his theory that Mother or someone else inflicted the injuries described in the dependency petition.

The juvenile court was free to assign value and weight to paternal grandparents' statements (see *In re Frederick, supra,* 96 Cal.App.3d at p. 367), and to the extent the referrals involved indirect risk to A.E. based on the allegations of physical abuse of his sibling, they were "unfounded" or "evaluated out." Unsubstantiated allegations from 2018 cannot serve to refute the substantial evidence supporting the juvenile court's finding that Father physically abused A.E. approximately five years later.

In finding the allegations in the dependency petition true, the juvenile court properly considered and relied on A.E.'s statements that Father hit him with a belt. "Courts evaluating abuse allegations must keep in mind that a

14

child's verbal and cognitive limitations may prevent [him] from providing an account of [his] abuse that is as coherent and consistent as we might expect from an adult. A child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust." (*In re I.C.* (2018) 4 Cal.5th 869, 896; see also *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [the testimony of a single witness, if believed by the factfinder, may constitute substantial evidence].)

The juvenile court also relied on the uncontroverted evidence from the medical providers, which Father attempts to minimize. He insists the video he took on the morning of May 2 at 8:10 a.m. establishes A.E. had no injuries before he was dropped off at school, and he misstates the record by claiming "[t]he child abuse expert agreed that the acute injuries she saw on [A.E.] would have shown up in father's video if inflicted by father." Dr. Laub's actual opinion was that "the acute markings seen on [A.E.] could show up within minutes of being injured up to one hour later." She explained the markings would have shown up in Father's video "*if [A.E.] was disciplined prior [to Father taking] the video*" and further clarified the injuries could have been inflicted "*after the video* was taken *or* when [A.E.] was home with the mother." (Italics added.) The juvenile court could properly rely on Dr. Laub's statements to infer that Father inflicted the injuries after taking the video at 8:10 a.m. but before dropping A.E. off at school at 8:45 a.m., and on appeal, we draw all reasonable inferences from the evidence to support the juvenile court's findings and order. (See *In re R.T., supra,* 3 Cal.5th at p. 633.)

Father's attempt to buttress his argument by noting the only injury observed by the referral reporter was a small healing scab on May 3 is similarly unavailing. The record does not suggest the referral reporter performed a fully body check or visualized other areas of A.E.'s body,

15

including his thighs, buttocks, and lower back that bore the additional markings observed by Dr. Laub during the physical abuse exam on May 5. Furthermore, although Father acknowledges "Mother claimed she first saw the marks on [May 2]," he ignores that Mother showed the social worker photographs she had taken of A.E.'s injuries at 3:37 p.m. on May 2 showing red markings on A.E.'s bare buttocks, back, and thighs.

Father's reliance on *In re G.Z.* (2022) 85 Cal.App.5th 857 is also misplaced. The Court of Appeal in that case reversed the jurisdictional findings because the medical expert had concluded the child's subdural hematomas may or may *not* have been caused by non-accidental trauma. The court explained "[i]t is not [the parent's] burden . . . to exclude nonaccidental inflicted trauma as a possible cause of G.Z.'s injuries. It is [the Agency's] burden to prove by a preponderance of the evidence that nonaccidental trauma was the cause of injury." (*Id.* at p. 878.) Unlike *In re G.Z.*, Dr. Laub unequivocally concluded the markings observed on A.E. were "diagnostic of physical abuse."

Lastly, Father argues A.E. was no longer at risk of future harm at the time of the contested jurisdictional/disposition hearing. The assertion of dependency jurisdiction under section 300, subdivision (a), is appropriate when "[t]he child has suffered, *or* there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent." (Italics added.) The juvenile court need not make an express finding of substantial risk of future harm; it's finding that A.E. had suffered serious physical harm inflicted nonaccidentally by Father is sufficient to support its jurisdictional order. (See *In re David H.* (2008) 165 Cal.App.4th 1626, 1644.) Furthermore, the court observed that A.E. did not sustain any injuries or bruising indicative of physical abuse while in Mother's

sole care.  (See *In re James D.* (1981) 116 Cal.App.3d 810, 813 [substantial evidence also includes circumstantial evidence and any reasonable inferences drawn from that evidence].)

In sum, we conclude there is substantial evidence in the record to support the juvenile court's assertion of jurisdiction over A.E. pursuant to section 300, subdivision (a).

DISPOSITION

The juvenile court's October 27, 2023 order is affirmed.

DO, J.

WE CONCUR:


IRION, Acting P. J.


CASTILLO, J.