Filed 5/14/13  P. v. Glasgow CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B236189 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA117358) |
| v. | |
| CHRISTOPHER GLASGOW, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed as modifed, and remanded with instructions.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II, Joseph P. Lee, and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Christopher Glasgow appeals from a judgment following convictions for first degree murder and possession of a firearm by a felon. He contends (1) that there was insufficient evidence to support his convictions, (2) that the trial court erred in admitting evidence of guns, ammunition, and narcotics that were not used to commit the crimes, (3) that the court erred in instructing the jury on an accomplice theory of liability, (4) that his confrontation rights were violated, and (5) that he was entitled to two additional days of custody credit. We conclude there was no error with respect to his convictions, but will remand with instructions to correct the sentence.

## STATEMENT OF THE CASE

On August 23, 2011, a jury found appellant guilty of first degree murder of Michael Scott (Pen. Code, § 187, subd. (a)),[1] and unlawful possession of a firearm (§ 12021, subd. (a)). It also found true the allegation that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). The jury found true that a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (b)-(e)(1)), but found not true the allegation that appellant personally and intentionally discharged a firearm (§ 12022.53, subds. (b)-(d)). In a bifurcated trial, the court found true the allegations that appellant suffered two prior serious felony convictions within the meaning of section 667, subdivision (a)(1), two prior prison terms within the meaning of section 667.5, subdivision (b), and two "strikes" within the meaning of sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) and (i). The court sentenced appellant to state prison

---

[1]     All further statutory citations are to the Penal Code, unless otherwise indicated.

2

for a total of 131 years to life, and assessed various fines and fees. The abstract of judgment reflected that appellant earned 524 days of actual presentence custody credit. Appellant timely appealed.

## STATEMENT OF THE FACTS

On March 12, 2010, Michael "Mikey" Scott was murdered. At the time he died, Mikey was 29 years old and a member of the Bounty Hunter Bloods gang. Mikey had lived with his wife, Lanisha, at the Nickerson Gardens housing complex for six years. Mikey's brother-in-law, Dante "Too Tall" Knox, also was a Bounty Hunter. Too Tall lived in Nickerson Gardens, in unit 105, which was known to be a "weed spot" where people regularly bought drugs. Lanisha identified appellant as "Bhris," a Bounty Hunter gang member who used to hang out often with Mikey and Too Tall. She testified that appellant was involved with drug sales at unit 105.

W.S., who was about 15 or 16 years old at the time of the murder, testified he lived in Nickerson Gardens. He looked up to Mikey as his big brother and hung out with him every day. On March 12, 2010, from about noon to 6:00 p.m., W.S. and Mikey were helping W.S.'s cousin, Naija Davis, move out of her apartment (unit 88). After they were done, the two men stayed at unit 88 and smoked marijuana. Shortly thereafter, they went across to unit 105, where they hung out with Bobby "Bob-O" Ervin, Too Tall, and appellant. W.S. knew appellant as "Bhris," and knew that appellant lived with his girlfriend, Annetta Alvarez, at another location.

After hanging out at unit 105, W.S., Mikey, and Bob-O went back to unit 88. Appellant came by and whistled for Mikey to come out. In a prior police interview, W.S. had told the officer that appellant was carrying a black nine-millimeter handgun and "acting like Rambo." W.S. also testified that a few days

3

before the murder, appellant was walking around unit 105 with a black gun, and that appellant "always" carried a nine-millimeter handgun. After Mikey and appellant talked outside, Mikey gave appellant some money and came back into the apartment.

Later that night, Mikey asked W.S. to deliver some cash to Davis, at her new apartment in another part of Nickerson Gardens. When he returned, W.S. testified he saw Mikey in the kitchen using a razorblade to cut up rock cocaine on a bread board. Mikey then told W.S. to leave. W.S. left for a party at another location. At the time, Bob-O was still with Mikey in unit 88. W.S. testified that his mother picked him up after the party ended, and they headed straight home. On the way, they passed by unit 88, at around 11:00 or 11:45 p.m. W.S. saw that the unit's back porch light and another light, the "high light," were both on.

Roman Garcia lived in unit 106 in Nickerson Gardens. The apartment had a rear entrance, which had a solid door and a screen door. On March 12, 2010, Garcia was watching television in his living room, located next to the rear entrance. The solid door was opened and the screen door closed. At around 10:00 p.m., Garcia heard three gunshots. Garcia ducked and waited about one minute. He then got up and peeked through the screen door. About five to eight minutes later, he saw a young Black male come out of unit 88, located about 43 feet across from and to the right of his apartment. The individual walked calmly toward the adjacent parking lot, entered a car, and was driven away. Garcia did not recognize the individual.

About 10 to 15 minutes later, Garcia saw another Black male come out of the same apartment. The individual was holding a black gun. As he walked toward the parking lot, he tucked the gun into his clothes. When he passed the parking lot, he ran away. At the preliminary hearing and at trial, Garcia identified

4

the second person as appellant. Garcia had seen appellant, Mikey, and Mikey's brother hanging out together near Garcia's apartment on weekends. Garcia admitted he previously told a police officer that he heard five gunshots, but explained the inconsistency as resulting from his efforts to erase the incident from his memory. He also acknowledged that at the preliminary hearing he had stated that appellant exited about 20 minutes after the first man exited.

That same night, Lanisha got home from a party at around 11:00 p.m. She called Mikey's cell phone repeatedly throughout the night, around 30 times, but did not get a response. At around 2:00 a.m. the next morning, Lanisha called Mikey's cousin, Tiffany. The two women went to the front door of unit 88, because Lanisha knew that Mikey had helped Davis move out of unit 88 that afternoon. The porch light of unit 88 was on, but there were no lights on inside the unit. After no one answered their knocks, the two women went home. Lanisha called Mikey's cell phone again, but got no answer. She finally went to sleep for a few hours.

Around 6:00 a.m., Lanisha called Davis. She told Davis that Mikey had not come home and asked her to let Lanisha into unit 88 to see if Mikey was there. The two women then went to unit 88, where no one answered the front door. They went to the back door, and found it unlocked but blocked. A homeless man helped them push through the door. He looked inside and told the women, "It's somebody behind here, bleeding real bad." Lanisha peeked inside and saw Mikey's body. Mikey was laying face down, holding some money in his hand. He had bullet holes in his head; Lanisha saw "the meat sticking out" of his head. She began screaming. Other people started coming to the apartment, and the police were called. Lanisha testified that no one entered the apartment before the police arrived.

5

Police Officer Scott Teubert, a member of the criminal gang homicide division of the Los Angeles City Police Department (LAPD), met Lanisha when he arrived at unit 88, around 7:00 or 7:30 a.m. Officer Teubert saw Mikey's body lying in a pool of blood, with his feet blocking the door. Officer Teubert did a search of the apartment. He saw three expended, brass colored, nine-millimeter RP Luger shell casings with copper colored jackets and one live nine-millimeter RP Luger hollow point bullet near the kitchen. He also saw a razorblade on the floor just outside the kitchen. Inside the kitchen, Officer Teubert saw a cutting board with a white substance resembling rock cocaine.

W.S. was awakened that morning by a neighbor who informed him and his mother that "Mikey [is] in there [unit 88], dead." W.S. got up and went to unit 88, where he saw police officers. W.S. also saw appellant near unit 88. W.S. thought appellant looked "strange" and was acting "weird." Appellant was "just moving too fast." Appellant also followed W.S. for about half an hour. He asked W.S. whether W.S. had heard "anything about him doing something to Mikey." W.S. said he had not. Appellant also asked W.S. if he was going to tell anyone who was in the apartment with Mikey on the night of the murder.

Although the police were at the crime scene, Garcia did not speak to the police about the shooting. He explained that people could not speak to law enforcement officers in public at Nickerson Gardens because they would risk being killed. A week later, after Too Tall asked Garcia to come forward, he and his sister went to the police station, and spoke with LAPD Homicide Detective Gerardo Pantoja about the shooting. Detective Pantoja and his partner, LAPD Detective Mario Aguilar, had been assigned to investigate Mikey's murder.

At around the same time that Garcia was speaking with Detective Pantoja, W.S. was confronted by appellant. W.S. was riding his bicycle in Nickerson

Gardens when appellant and Bob-O "rolled up" on him in a blue Ford Expedition. Appellant was driving. He had a handgun on the left side of his waistband. The handgun was different from the gun he was carrying on the day of Mikey's murder. Appellant and Bob-O asked W.S. if he knew anything about Mikey being a snitch. When W.S. said he did not, appellant said, "Yeah, he snitched." Appellant also asked W.S. if he had talked to anyone. When W.S. said he had not, appellant responded, "Why are you telling the police I supposedly killed Mikey?" Appellant then drove away. According to W.S., appellant did not hang around Nickerson Gardens as much after Mikey's murder. W.S. contrasted this to Bob-O, who was not "hiding his face."

The autopsy of Mikey's body was conducted by Dr. Jeffrey Gutstadt, who was unavailable for the trial. Los Angeles County Medical Examiner Dr. Eugene Carpenter reviewed the records related to the autopsy. Dr. Carpenter opined that Mikey died as a result of three gunshot wounds to the head.

On April 14, 2010, LAPD Officer Manuel Moreno was assigned to keep watch on the home of appellant's girlfriend, Alvarez, because police officers were planning to conduct a search of the house that day. At around 11:30 a.m., Officer Moreno observed a blue Ford Expedition pull into the driveway of the house. Appellant exited, unlocked the front door, and entered the house. Two other individuals, later identified as Bob-O and appellant's sister, Lisa Glasgow, also exited the vehicle and went into the house. Less than 10 minutes later, the three reentered the vehicle. Lisa was driving, and shortly thereafter, she ran a red light. Police officers decided to initiate a traffic stop of the vehicle, but Lisa would not comply, and a car chase ensued.

The police followed the Expedition into Nickerson Gardens. Officer Moreno had followed the progress of the chase, and he positioned his car on a

major street, just south of Nickerson Gardens. Within a few seconds of hearing other officers broadcast that they were in foot pursuit, Officer Moreno saw appellant running toward his location. As he ran, appellant took out a black semi-automatic style handgun from his waistband and threw it up onto the roof of a one-story building. The gun was recovered; it was a .40-caliber handgun loaded with five .40-caliber rounds. After appellant was detained, Officer Moreno searched him and recovered a set of keys.

That same day, LAPD Detective Erik Shear, who was assigned to the southeast division gang impact team, and other police officers executed a search warrant at the home of Alvarez. The officers entered the house using the set of keys that Officer Moreno had recovered from appellant's person. Officers found numerous items of evidence indicating that appellant lived at the address, including his California driver's license, men's clothing, an auto repair receipt with his signature, and a photograph of appellant and Alvarez.

Officers also found close to 180 grams of rock cocaine inside a gold purse, located between shoe boxes in the bedroom closet. The rock cocaine was packaged in multiple bags, most containing approximately a quarter ounce of rock cocaine. Detective Shear opined that the amount of rock cocaine was not indicative of possession for personal use. Officers also found a large plastic baggie containing threes ounces of high-grade marijuana in the closet. No smoking paraphernalia was found in the house. In addition, $1,885 in cash, a digital scale, and empty baggies were also recovered.

In a dresser in the bedroom, the police found a fully loaded stainless steel .357-caliber handgun, additional .357-caliber ammunition, and two nine-millimeter RP Luger hollow point bullets with brass colored casings. A loaded SKS assault

8

rifle was found in the corner of the bedroom closet. None of the guns were registered to Alvarez.

LAPD criminalist William Moore examined the various bullets recovered by the police officers. He determined that all of the bullets recovered from the crime scene were nine-millimeter RP Luger hollow point bullets, and were fired from the same firearm. The two expended bullets recovered from Mikey's body were consistent with nine-millimeter caliber hollow point bullets with copper alloy jackets fired from the same firearm. Finally, the two live rounds recovered from the dresser in Alvarez's house were nine-millimeter RP Luger hollow point bullets with copper alloy jackets.

Los Angeles County Deputy Sheriff Armando Martinez testified as an expert on cell phone data records and cell phone use. He explained that cell phones communicate with other devices by using cell phone towers. The towers keep data on cell phones that are used within their range. Accordingly, cell phone data records can show the general location of a cell phone used to make or receive a call, within a certain radius from the cell phone towers. Deputy Martinez reviewed the cell data record for appellant's cell phone. He stated that on the night of the murder and around the time of the murder, appellant's cell phone was used within the general cell phone coverage area of Nickerson Gardens.

Los Angeles Police Officer Francis Coughlin testified as an expert on the Bounty Hunter Bloods gang. He testified that the gang had between 800 and 1,000 active members. Within Nickerson Gardens, he estimated there were approximately 600 to 700 Bounty Hunter gang members. Officer Coughlin testified that the gang's primary activities included committing vandalism (graffiti), robberies, rapes, shootings and killings, selling drugs and carrying guns. He testified that the gang controlled drug dealing within Nickerson Gardens.

Someone who was not a Bounty Hunter gang member would not be allowed to sell there. Officer Coughlin further testified that Bounty Hunters were notorious for assaults and killing their own members. Officer Coughlin also testified that Mikey had given him information about drugs and gangs for several years as a confidential informant.

Officer Coughlin testified that appellant had previously admitted to him that appellant was a Bounty Hunter gang member. In addition, appellant had many gang tattoos, including a "five stars" tattoo, indicating he was a "general" within the gang. Officer Coughlin explained that appellant had the moniker "Bhris" because he substituted the "C" in his first name, Christopher, with a "B" for "Blood."

Addressing a hypothetical killing whose facts mirrored this case, Officer Coughlin opined that the killing benefitted the Bounty Hunter Bloods gang as a whole, and also benefitted the individual who committed the shooting. Officer Coughlin explained that the killing would increase the community's fear of the gang, and that the gang would benefit from community members' fear and reluctance to report crimes committed by gang members. It also benefitted the gang if the victim was a "snitch," because it sent the message that "if you snitch, [that] is the price you're going to pay." The "status" of the individual who killed a "snitch" is dramatically elevated within the gang, and the fact that the victim was a snitch would make the gang look even more favorably upon the killer.

During the defense case, LAPD criminalist Ernest Park testified that he tested swabs taken from the crime scene. Some of the swabs contained DNA that matched Mikey's DNA profile, but Park could not testify that any of the swabs contained DNA that matched the DNA profiles for W.S. or appellant. Frank Giles, a fingerprint specialist with the LAPD, testified that prints lifted from a bottle and

10

a cup in unit 88 matched that of Mikey and of W.S., respectively. No other fingerprints were identified as belonging to anyone else.

Demeterius Webster, Mikey's cousin, testified that he was present when Mikey, appellant, and other gang members were at Too Tall's apartment on the night of the murder. He came to the apartment around 6:30 p.m., and left about an hour later. Webster testified that Too Tall had accused him of killing Mikey. Webster, a former member of the Bounty Hunters, testified he never knew appellant to be involved in selling drugs; nor did he know if Mikey was selling drugs out of unit 88. Webster did not see appellant with a gun that night

Dr. Robert William Shomer testified as an expert on eyewitness identification. He testified about the general unreliability of eyewitness identification, including issues related to perception and bias. Given a hypothetical based upon the identification of appellant by Garcia, Dr. Shomer opined that a week's delay in identification greatly reduced the accuracy of the identification because of "substantial memory decay." He also opined that time estimates are very subjective, and that looking through an obstruction like a screen door makes an identification of someone more than 30 feet away extremely difficult.

## DISCUSSION

Appellant contends (1) there was insufficient evidence to support his conviction for first degree murder because Garcia's identification was unreliable; (2) there was insufficient evidence to support the jury's finding that the object in appellant's hand on the night of the murder was a real firearm, as opposed to a toy gun; (3) the trial court erred in admitting evidence about weapons, ammunition, and narcotics in appellant's possession because that evidence was irrelevant and prejudicial; (4) the trial court erred by instructing the jury it could find appellant guilty based on accomplice liability because the prosecution did not rely upon that

11

theory during the case; (5) the admission of Dr. Carpenter's testimony regarding the autopsy performed by Dr. Gutstadt violated his constitutional right to confrontation; and (6) the court erred in not awarding him the correct amount of actual presentence custody credit.

### A. Sufficiency of the Evidence

"In determining whether the evidence is sufficient to support a conviction . . . , 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Appellant contends no substantial evidence supports the jury's finding that he was involved in Mikey's murder. He contends there was no physical evidence, such as DNA or fingerprints, linking him to the murder. He notes there was no confession or percipient witness. Finally, he contends that Garcia's identification

12

was unreliable. He suggests that Garcia's testimony at trial was inconsistent with his prior testimony. Dr. Shomer also opined that the circumstances of the identification made it very unreliable. Finally, he contends that the lighting conditions made it impossible for Garcia to accurately identify appellant.

The jury convicted appellant of murder, thus impliedly finding that appellant was involved in Mikey's murder. As discussed, this court does not resolve credibility issues. Rather, "[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence . . . . [Citations.]" (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366, fn. omitted.) Here, Garcia testified that he heard gunshots, and shortly thereafter, he identified appellant as the second person who exited unit 88. This testimony was sufficient to sustain the conviction. Appellant contends that the lighting conditions made it physically impossible for Garcia to identify appellant, but Lanisha and W.S. testified that unit 88's porch light and the "high light" were both on. Thus, it was neither physically impossible nor inherently improbable that Garcia, who had seen appellant before, correctly identified him as the second man who exited unit 88. In addition, Garcia's identification was supported by (1) appellant's cell phone data showing he was in the general area of the crime scene, and (2) W.S.'s testimony about appellant's behavior after the murder, indicating that appellant demonstrated a consciousness of guilt. Accordingly, there was substantial evidence to support appellant's conviction for the murder of Mikey.

Appellant next contends there was insufficient evidence to sustain his conviction for possession of a firearm on the night of the murder. He contends that Garcia could not determine whether the black gun he was holding in his hand when he exited unit 88 was a real gun or a toy gun. Because the gun was never

recovered, he contends no substantial evidence supports the jury's finding that he unlawfully possessed a real firearm. We disagree.

In *People v. Monjaras* (2008) 164 Cal.App.4th 1432, the appellate court reaffirmed that "[t]he fact that an object used [to commit a crime] was a 'firearm' can be established by direct or circumstantial evidence." (*Id*. at p. 1435.) In that case, the defendant told the victim to give him money and pulled up his shirt to show the handle of a black pistol stuck in his waistband. The appellate court found this factual scenario was sufficient to support the jury's finding that the black pistol in defendant's waistband was a real firearm. (*Id*. at pp. 1436-1438.) Here, Garcia heard gunshots, and shortly thereafter, saw appellant holding a handgun. Appellant then tucked the handgun away before he left the scene. Within hours, the victim was found in the apartment, shot to death. This evidence was sufficient to support the jury's finding that appellant possessed a real firearm the night of March 12, 2010. Moreover, there is no evidence that appellant owned toy guns or carried toy guns. W.S. testified that appellant always carried a nine-millimeter handgun. In addition, on April 14, 2010, appellant had been in possession of a real firearm, which he had thrown away during the foot pursuit. In short, there was substantial evidence to support appellant's conviction for unlawful possession of a firearm.

B.     Admission of Allegedly Prejudicial Evidence

Appellant contends the trial court abused its discretion in admitting evidence of other guns, ammunition, and narcotics that were not used to commit the charged crimes, because that evidence was irrelevant and unduly prejudicial. Defense counsel had raised the same objections during trial, arguing that the evidence was more prejudicial than probative under Evidence Code section 352, and was inadmissible character evidence under Evidence Code section 1101, subdivision

14

(b).  After conducting an analysis under Evidence Code sections 352 and 1101, subdivision (b), the court admitted the evidence over defense objections, but instructed the jury that the evidence was admitted for the limited purpose of motive.

We conclude the trial court did not abuse its discretion in admitting the evidence of the guns, ammunition, and narcotics because that evidence was relevant to show that appellant was a drug dealer and that he might have the motive to kill someone who "snitched" about his drug-dealing operations.  (See *People v. Daniels* (1991) 52 Cal.3d 815, 856 [under Evid. Code, § 1101, subd. (b), a prior offense may be used to show "motive, intent, preparation or identity"]; *Ybarra v. Illinois* (1979) 444 U.S. 85, 106 ["In the narcotics business, 'firearms are as much "tools of the trade" as are most commonly recognized articles of narcotics paraphernalia.' [Citation.]"].)  In addition, two rounds of ammunition found at Alvarez's home were of the same type as the ammunition used to kill Mikey -- a fact relevant to whether appellant was involved in Mikey's murder.

Moreover, even had the trial court erred, we would find any error harmless under *People v. Watson* (1956) 46 Cal.2d 818.  Garcia positively identified appellant as the second person who exited unit 88, shortly after he heard three gunshots.  Mikey was subsequently found in unit 88, dead from three gunshot wounds to his head.  On this record, it was not reasonably probable that a result more favorable to defendant would have been reached, absent the admission of evidence that appellant possessed other guns, ammunition, and narcotics.  (*Id*. at p. 837.)

C.     Accomplice Instruction

Appellant contends the trial court erred in instructing the jury that appellant could be found guilty of murder based on an aiding and abetting theory, as that

15

theory was never proffered by the State and there was no evidence to support it. We discern no error.

It is well settled that in a criminal case the trial court has the duty to instruct, sua sponte, on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) "[T]he duty to instruct applies regardless of the parties' requests or objections, . . . prevents the 'strategy, ignorance, or mistakes' of *either* party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourages 'a verdict . . . no harsher *or more lenient* than the evidence merits' [citation], and thus protects the jury's 'truth-ascertainment function' [citation]." (*Id.* at p. 155.) Here, the trial court overruled the defense objection and gave the accomplice instruction based on the evidence presented during the trial. The court explained that Garcia saw two people come out of unit 88, but there was no percipient witness to the actual shooting. Thus, it was possible that the other individual was the shooter, and that appellant aided and abetted him. Moreover, although it was not the main focus of the prosecutor's case, during closing argument, the prosecutor told the jury that it could convict appellant if the jury thought "'[appellant] gave the gun to the other guy, had the guy shoot, took the gun back, and then walked out.'" Thus, the accomplice instruction was supported by the evidence at trial and was relied upon by the prosecution. In short, there was no error.

D.    Confrontation Clause Claim

Appellant contends that Dr. Carpenter's testimony about Mikey's cause of death, based upon his review of the autopsy records, violated appellant's constitutional right to confront and cross-examine the doctor who actually performed the autopsy, Dr. Gutstadt. We conclude this argument has been

16

forfeited because no objection was made at trial. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19.)

Even were we to find it not forfeited (and to address appellant's ineffective assistance of counsel claim), we would reject the argument on the merits. In *People v. Dungo* (2012) 55 Cal.4th 608, published after appellant filed his opening brief, the California Supreme Court held there was no violation of a defendant's confrontation rights where a forensic pathologist, who did not perform the autopsy of the victim, reviewed the autopsy records and provided his own independent opinion about the cause of the victim's death. (*Id.* at pp. 618, 621.) The same factual scenario is present here. In light of *People v. Dungo*, appellant's claim of error must be rejected. (*Auto-Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

E.      Custody Credits

Finally, appellant contends he is entitled to 526 days of credit for presentence custody. The People agree, and request that this court correct the sentence. (*People v. Guillen* (1994) 25 Cal.App.4th 756, 764.)  Accordingly, we will modify the abstract of judgment to reflect that appellant earned 526 days of actual presentence custody credit.

## DISPOSITION

The abstract of judgment is modified to reflect that appellant earned 526 days of actual presentence custody credit. The judgment is affirmed in all other respects. The superior court is directed to prepare an amended abstract of judgment reflecting the additional days of custody credits, and to forward a copy of

17

the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**


                                                MANELLA, J.


We concur:


WILLHITE, Acting P. J.


SUZUKAWA, J.

18