Filed 9/14/22  P. v. Raya CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CESAR RAYA,<br><br>    Defendant and Appellant. | F081547<br><br>(Super. Ct. No. VCF347877B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Robert K. Gezi, Kari Mueller, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Cesar Raya and his codefendant, Vincent Prado-Lopez,[1] entered an occupied home in Exeter in the early morning hours. They eventually woke the home's occupants, one of whom was shot in the arm during the encounter. Defendant and Prado-Lopez fled the home with various items belonging to the occupants, including firearms.

Defendant was convicted by jury of attempted murder (Pen. Code,[2] §§ 187, 664; count 1), two counts of residential robbery (§§ 211, 213; counts 2-3), residential burglary (§§ 459, 460; count 4), and assault with a semiautomatic firearm (§ 245, subd. (b); count 5). As to each count, the jury found true a gang enhancement (§ 186.22, subd. (b)(1)(C)) and firearm enhancement (§ 12022.5, subds. (a), (d)). As to counts 1 through 3, the jury also found true the allegation that a principal discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)).[3] In addition, defendant pled guilty to one count of vandalism arising from an unrelated incident. (§ 594, subd. (a); count 11). Defendant was sentenced to an aggregate term of 75 years to life plus 13 years.

On appeal, defendant contends his conviction of attempted murder is not supported by substantial evidence of intent to kill. He additionally contends the judgment must be reversed because the trial court declined to bifurcate trial of the gang allegations,

---

[1] Prado-Lopez's case was severed prior to trial and he is not a party to this appeal.

[2] Undesignated statutory references are to the Penal Code.

[3] The jury found not true the allegation on count 1 that the attempted murder was premeditated (§ 664, subd. (a)), the allegation on counts 1 through 3 that defendant personally and intentionally discharged the firearm causing great bodily injury (§ 12022.53, subd. (d)), and the allegation on counts 1 and 2 that defendant personally caused great bodily injury (§ 12022.7, subd. (a)).

Additionally, prior to trial and on the People's motion, count 6 (Veh. Code, § 10851, subd. (a)) and count 12 (§ 148, subd. (a)(1)) were dismissed. Counts 7 through 10 alleged offenses only as to Prado-Lopez.

as required under the newly enacted section 1109. (Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333); Stats. 2021, ch. 699, § 5.) He further contends the testimony of the People's gang expert was insufficient to support the gang allegations in light of amendments to section 186.22 made after trial. (Assembly Bill No. 333; Stats. 2021, ch. 699, § 3.) He also contends his sentence constitutes cruel and unusual punishment under the California Constitution, and resentencing is required under recent amendments to section 1170 (Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567); Stats. 2021, ch. 731, § 1.3).

We conclude the conviction of attempted murder is supported by substantial evidence. We conclude nonbifurcation of the gang allegations was harmless. However, as the People concede, the amendments to section 186.22 apply retroactively and require us to reverse the gang enhancements to all counts (§ 186.22, subd. (b)(1)(C)) and the gang-related firearm enhancements to counts 1 through 3 (§ 12022.53, subd. (e)(1)). We remand for the People to prove the applicability of the enhancements under the amendments to section 186.22, if they choose, and for a full resentencing. In light of this disposition, we do not address defendant's remaining contentions regarding the sentence, which are rendered moot by this disposition.

## FACTS

### I.     The Shooting

At approximately 4:00 a.m. on February 23, 2017, Tyler and Amanda W.[4] were asleep in their home in Exeter.[5] Tyler awoke suddenly and saw two men entering the

---

[4] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

[5] A neighbor drove past Tyler and Amanda's house between midnight and 2:00 a.m. and observed the garage door to be open. The neighbor testified this occurred on February 27, 2017, but an officer testified that the neighbor reported the open garage door on the morning of the incident. Tyler testified that he had closed the garage door the

room. One person came toward Tyler, between the bed and a laundry hamper, and the other moved closer to the bathroom. The bedroom was dark and the individuals were backlit from a hallway light. Tyler screamed and lunged out of bed. He saw that the person closer to him had a gun and was pointing it at Tyler. Tyler reached for the gun and made contact with either the gun or the individual's arm or hand. The gun went off and Tyler was shot and fell to the floor. He then heard another shot. Tyler did not see the person who shot the second shot, but Amanda testified that the second shot came from a person who was standing over Tyler. Amanda got out of bed and screamed at the men to get out of the house. The person near the bathroom ran out of the room, followed by the person near the hamper. Amanda saw the man by the hamper swing his arm to the left, pointing a handgun toward her as he left. By the time Amanda got to Tyler's side of the bed, both men had left the room. Tyler testified he believed the man near the bathroom ran out of the room prior to the second shot.

Tyler grabbed Amanda and shut the bedroom door. He retrieved a Smith and Wesson XD .40-caliber semiautomatic firearm from beneath the bed but was unable to load it because he had been shot in the arm. Amanda loaded the gun and called 911. The couple went into the bedroom closet, closed the door, and waited there until police arrived.

Tyler later underwent surgery on his arm and spent three days in the hospital. He also had a bruise on his back or rib cage area, which he believed came from a bullet hitting the ground next to him. He was off work and on medication for approximately one month and had scarring at the time of trial.

---

night before, but suggested his cat may have run out of the garage and triggered the door to reopen without him knowing.

## II. The Investigation

### A. The Crime Scene

When law enforcement arrived on scene, the garage door was open and lights were on in Tyler and Amanda's house. Tyler and Amanda's living room was in disarray. A live round of Smith and Wesson .40-caliber ammunition was found in the living room carpet. An Xbox and other items had been moved. Tyler was missing a Browning "camo pump" 12-gauge shotgun and a pellet gun, both of which had been kept in the garage, as well as a Benelli Nova 12-gauge shotgun that had been kept in a closet in an extra bedroom. Amanda had left her laptop in a bedroom she used as an office, but found it in the living room on the morning of the incident. Papers on her desk were scattered and the closet door in the office was open. Her keys were missing.

In Tyler and Amanda's bedroom, officers found bullet fragments and two .40-caliber Smith and Wesson bullet casings from a .40-caliber firearm. There also were holes in the carpet at the foot of the bed with bullet fragments next to it.

Neither Tyler nor Amanda saw the perpetrators' faces. Amanda described both subjects as wearing dark clothing, ski masks, and black gloves. She reported that both were approximately six feet in height with a thin build, and one was more aggressive than the other.

Tyler believed the perpetrators were wearing masks or "hoodie[s]" because their faces were completely dark. He described the person who shot him as less than six feet tall, and acknowledged that he previously testified the shooter was thin and skinny, while the other person was stockier and shorter. Tyler reported he was sure he saw one gun but he believed both men may have had guns.

### B. Video Surveillance

Police obtained surveillance video from a home on a street perpendicular to the court where Tyler and Amanda lived. The video was published to the jury and showed the following. At approximately 3:44 a.m., a 1990's model Chevy or GMC pickup truck

5.

with side step appeared in the video and turned onto Tyler and Amanda's court. Two people could be seen in the vehicle. Tyler and Amanda's garage door light was activated. The truck then drove onto an adjacent street. At 3:46 a.m., Tyler and Amanda's garage light deactivated. The truck was then seen traveling on a street behind Tyler and Amanda's court.[6] At 3:49 a.m., Tyler and Amanda's garage light was activated and a person appeared in front of Tyler's truck, which was parked in the driveway. For approximately the next 15 minutes, two figures moved around the driveway, garage, and truck. At 4:06 a.m., the garage light deactivated. At 4:08 a.m., movement can be seen and the garage light reactivated. The garage light deactivated again at 4:14 a.m. At 4:24 a.m., the garage light reactivated and one subject ran in front of the truck, while another subject ran down the driveway. At 4:28 a.m., the garage light deactivated, and at 4:29 a.m., law enforcement arrived.

### C. Apprehension of Defendant and Prado-Lopez

Based on video surveillance of a separate incident at a nearby court on February 21, 2017, police obtained information regarding defendant, and obtained search warrants for residences associated with defendant in Visalia and Woodlake. At defendant's Visalia residence, police located a truck consistent with the truck that appeared in the surveillance video from the scene. One particle of gunshot residue was found on the gearshift knob of the truck, and particles consistent with gunshot residue were found on the inside driver's door handle. A flashlight, beanie, ball cap, gray sweatshirt, and two remotes were inside the truck. In defendant's room, police located a black sweatshirt, a white hockey mask with three dots on the left lower eye, and two black gloves. Defendant was arrested following the search. Officers did not find relevant evidence at defendant's father's house in Woodlake.

---

[6] At the end of Tyler and Amanda's court was a small breezeway that allowed pedestrian access to another street.

On February 24, 2017, police responded to an unrelated disturbance at an apartment in Visalia. Inside the subject apartment, a kitchen table and a chest were marked with gang graffiti. A set of house keys with car keys for a Hyundai was on the kitchen table. A bill on the table suggested Prado-Lopez lived at the apartment. Police also found two shotguns and a pellet gun on a bed, a bandoleer with shotgun shells, ammunition in a closet and inside a drawer, and nonexpended shotgun shells on the floor. Tyler later identified the guns, ammunition, bandoleer, and extra shells as his. The keys recovered from the apartment belonged to Amanda.

Prado-Lopez was arrested on February 28, 2017, in relation to the investigation of an unrelated shooting. At that time, Prado-Lopez was in possession of a nine-millimeter Glock handgun with a 30-round magazine. No .40-caliber weapon was recovered during the investigation.

Records from Prado-Lopez's cell phone showed that Prado-Lopez's phone pinged cell phone towers in Visalia at 11:58 p.m. on February 22, 2017, then, between 3:32 a.m. and 4:24 a.m. on February 23, 2017, pinged towers that covered the area of the crime scene in Exeter. At 5:10 a.m., the cell phone again pinged a tower in Visalia.

### D.     Defendant's Statements

Defendant provided two statements to police.

In his first statement, defendant stated that, on Tuesday, he was at a gathering when individuals he knew as "Dopey and Maniac" from the "Vicky's Town" gang asked to borrow his truck to go to the store.[7] When they did not return by 5:00 a.m., defendant left the gathering. When defendant returned, Dopey told him they had come upon a television and other items. Defendant was upset and left. He saw a remote control in his

---

[7] As noted above, defendant's truck was implicated in a separate incident on Tuesday, February 21, 2017.

truck. He spent the following day with his girlfriend, then spent the night at his brother's house in Woodlake.

When officers informed defendant that his truck was connected to both a burglary of televisions and a separate burglary that involved a shooting, he acknowledged participation in both incidents. As to the first incident, defendant stated that he was offered money to drive Dopey and Maniac (who defendant also knew as Vincent) to Exeter, where they told defendant to pull over and knock on a door. When no one answered, Dopey and Maniac left while defendant remained in the parked truck. Dopey and Maniac came back with two televisions, a PlayStation, and a DVD player, and told defendant they were done for the day and would come back the next day.

Defendant reported that he took them back the next day and parked next to some orchards while Dopey went to go knock at a house. He explained that there was a walkway from the street with the orchards to a court, where there was a house that looked "alone" and had an open garage door. Defendant waited for approximately 30 minutes before Dopey and Maniac returned, running. They threw items in the back of the truck, then told him not to leave because there was more stuff. They went back to the house approximately three times to retrieve items from the garage and defendant recalled that Dopey returned with two "[b]ig guns." On the fourth time, Dopey and Maniac entered the house. Defendant heard two gunshots then saw Dopey and Maniac come back running. Dopey told defendant the victim woke up during the burglary and Dopey shot him by accident. Dopey thought he struck a wall and not the victim. Defendant reported that he was paid $50 for the first night of driving, and $100 for the second. He did not keep any of the items from the house. Later in the interview, defendant acknowledged that Dopey did not exist and instead implicated Maniac and someone named "TK" in the incident. He reported that both TK and Maniac had Glocks, one with an extended clip.

Officers returned to speak with defendant on February 27, 2017, and advised him that video surveillance showed only two people in the truck. Defendant then admitted

that only he and the person he knew as Vincent participated in the burglary. Defendant explained that he and Vincent saw the garage door was open, and Vincent told him to park on the side. Defendant at first maintained he remained in the car with the engine running while Vincent went inside. He later stated he went into the garage, but only Vincent went inside the house.

When officers advised defendant that they knew two people entered the house, defendant admitted he was in the house. He acknowledged entering the bedroom but initially stated Vincent fired both shots. Officers advised defendant that bullet casings in the room suggested more than one gun was fired.[8] Defendant then acknowledged holding a gun, but stated he handed it to Vincent, who fired with both hands. When officers suggested this was implausible, defendant stated he had a gun in his hand, but dropped it after Vincent fired the first shot, and his gun went off accidentally. He then picked up the gun and ran. Defendant stated his gun was a "Zig Zeller" and later identified it by photograph as a Sig Sauer semiautomatic handgun. When officers informed defendant such accidental discharge is not possible with that type of gun, he admitted he accidentally pulled the trigger, then dropped the gun. Eventually, defendant explained he had run into higher ranking gang members, and they told him it was time for him to go "out there" or they were going to come looking for him.

## III. Gang Evidence

### A. Gang Evidence as to Defendant

Numerous officers testified regarding prior contacts with defendant and Prado-Lopez.

In September 2013, former Woodlake Police Officer J. Mendez contacted defendant, who admitted his involvement in a break-in at a market. The other individual involved in the break-in was affiliated with Woodlake Brown Pride, a Sureño gang made

---

[8] At trial, one of the officers characterized this statement as a ruse.

up mostly of juveniles. Mendez testified he knew defendant to affiliate with Woodlake Brown Pride. In October 2013, Mendez again contacted defendant, who admitted to a residential burglary.

In January 2014, former Tulare County Correctional Officer R. Leach conducted a cell search of defendant's cell at a juvenile facility and observed tagging by the door consisting of the words "Woodlake," "Brown," and "Pride"; "WBP 13" with three dots; "East Side Pix[l]on" with the "N" written backwards and crossed out; and "ESP" with three dots. He testified that the number 13 and three dots were Sureño gang symbols.

In August 2015, former Woodlake Police Officer J. McMillan contacted defendant in relation to a suspicious persons call. Three other individuals involved in the contact were known members of Sur Town Locos, a Sureño subset out of Exeter. Defendant admitted active membership in Sur Town Locos.

In January 2016, McMillan contacted defendant while investigating a stolen vehicle. Defendant reported that the person arrested during the stop of the stolen vehicle did not like defendant because defendant's family was Sur Town Locos and the driver was a member of a rival Sureño gang.

In December 2016, former Tulare County Probation Officer J. Sanchez did a detention intake assessment of defendant at a juvenile detention facility. Defendant revealed that he previously was a "South" gang member but was no longer associating with or involved in gangs. Defendant acknowledged that his "LP" tattoo stood for "Loco Park." J. Sanchez again conducted a detention intake assessment of defendant in February 2017, and defendant again stated he was no longer associated with the gang. However, J. Sanchez documented defendant as an active Loco Park gang member as of February 2017.

In January 2020, Tulare County District Attorney Investigator J. Lee photographed defendant's tattoos, which included three dots on his wrist, "LP" on his forearm, the word "wood" on his right wrist, and the word "lake" on his left wrist.

10.

### B. Gang Evidence as to Prado-Lopez

In August 2011, Tulare County Sheriff's Deputy S. Sanchez conducted a probation search of the residence of a known Sureño gang member from the Loco Park subset. Also at the home were the subject's girlfriend, who was a known Sureña ("a female Sure[ñ]o"), and Prado-Lopez, who had three dots tattooed on his elbow. Prado-Lopez admitted he was trying to get jumped in to Loco Park.

In December 2011, Visalia Police Officer J. Arjona contacted Prado-Lopez in relation to a vehicle stop. Prado-Lopez was known to Arjona as a Sureño, and was with a known Sureño gang member. Prado-Lopez admitted he had been a Sureño for a year and a half. Arjona prepared a field interview card documenting Prado-Lopez's gang involvement.

In November 2012, former Visalia Police Officer G. Vang contacted Prado-Lopez in relation to a report of suspicious persons on the roof of a supermarket. Vang knew Prado-Lopez from prior contacts and knew him to be a Sureño. He documented that Prado-Lopez had tattoos of three dots on his left arm, left elbow, and middle finger.

When officers entered the apartment associated with Prado-Lopez on February 24, 2017, they found gang graffiti, including "LP" and "X3" on the dining table, and "LP" on a chest in the closet.

When Prado-Lopez was arrested on February 28, 2017, officers noted he had multiple tattoos of three dots and a neck tattoo of "Loco Park" in large letters. He had an "L" tattoo under one eye and a "P" tattoo under the other eye.

In January 2020, Tulare County District Attorney Investigator J. Lee photographed Prado-Lopez's tattoos, which included a backwards "N" with either a "V" or "K" and a single dot on his right hand, three dots in multiple locations, "P" with a single dot under his left eye, "Loco Park" on his neck, and "LP" on the back of his head and behind his left ear.

11.

## C.    Gang Expert

Exeter Police Officer A. Salinas was designated as the People's gang expert.  He assisted in the arrest of defendant and also responded to Prado-Lopez's apartment.  He was familiar with Prado-Lopez, having had one prior contact with him.  Salinas opined, based on the aforementioned law enforcement contacts, that defendant and Prado-Lopez were Loco Park gang members at the time they committed the instant offenses.

Salinas was presented with hypothetical facts mirroring the instant home burglary, robbery, and shooting, and opined such crimes would be committed at the direction of, in association with, and for the benefit of the gang.  He testified the offense would benefit the gang by instilling fear in the community and letting rival gang members and community members know that Sureños "are going to carry weapons and use them." (Boldface omitted.)  He further testified the crimes would garner respect for the gang members who committed them and would show they were fearless.  He additionally testified that firearms stolen during the offenses could be sold or used to commit other crimes.

Two predicate offenses were offered to establish a pattern of criminal gang activity.  One offense, a 2011 conviction for unlawful possession of a firearm with a gang enhancement, was committed by an individual Salinas identified as a member of the Loco Park subset of the Sureño gang.  The individual admitted he possessed the firearm to protect himself from the Norteño gang.  The other offense, a January 2013 conviction for assault with a deadly weapon, was committed by a different individual Salinas identified as a member of the Loco Park subset of the Sureño gang.  The assault was against a Norteño gang associate and involved yelling gang slurs.  Additionally, the purpose of the offense was to instill fear.

## DISCUSSION

### I.    SUFFICIENCY OF THE EVIDENCE

Defendant contends his conviction of attempted murder on count 1 must be reversed for insufficient evidence of his intent to kill.  We conclude substantial evidence supports the conviction.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt.  (*People v. Flores* (2020) 9 Cal.5th 371, 411.)  Substantial evidence is evidence which is "reasonable, credible, and of solid value."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  An appellate court must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' "  (*People v. Flores*, at p. 411.)  An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367).  "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding."  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)  Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence.  (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Defendant was convicted on count 1 of attempted murder.  " 'The mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices. [Citation.]' [Citation.]  In contrast, '[a]ttempted murder requires the

13.

specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.] Hence, in order for defendant to be convicted of the attempted murder . . . , the prosecution had to prove he acted with specific intent to kill that victim." (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Intent to kill can be established by showing that the assailant either desired the result, i.e., death, or knew to a substantial certainty that the result would occur. (*Ibid.*)

Here, the jury found not true the allegations that defendant personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), and personally caused great bodily injury (§ 12022.7, subd. (a)). These findings suggest the jury concluded the evidence did not establish, beyond a reasonable doubt, that defendant fired the shot that hit Tyler in the arm.

However, the jury may have concluded defendant fired the second shot, which hit the ground near Tyler. Defendant admitted that he entered the bedroom with a gun and pulled the trigger on that firearm. Gunshot residue in his vehicle corroborated this account. Although Tyler and Amanda's testimony suggested both shots may have been fired by the same individual, it was for the jury to resolve this conflict in the evidence. (*People v. Solomon* (2010) 49 Cal.4th 792, 818 [" 'Resolution of . . . inconsistencies in the testimony is the exclusive province of the trier of fact.' "].) Furthermore, other evidence regarding the second shot was sufficient to support a finding that the shooter acted with intent to kill, either desiring death to result or with knowledge there was a substantial certainty that death would occur. (See *People v. Smith*, *supra*, 37 Cal.4th at p. 739.) The shot was fired in a confined, occupied bedroom, in the dark and at close range. It hit the ground close enough to Tyler to cause bruising on his back or rib cage area. Furthermore, although defendant stated that he pulled the trigger accidentally, Amanda testified that the second shot came from an individual standing directly over Tyler, pointing the gun at him.

The foregoing constitutes substantial evidence of intent to support the conviction of attempted murder.

## II. SECTION 1109

Assembly Bill No. 333 was enacted during the pendency of this appeal and added section 1109, which requires bifurcation of the trial of gang enhancements and substantive gang offenses from that of the underlying offenses upon a defendant's request. (§ 1109, subds. (a), (b).) Defendant contends the newly enacted section 1109 applies retroactively to him and the court's failure to bifurcate entitles him to complete reversal of the judgment. The People argue section 1109 does not apply retroactively and, in any event, any error in failing to bifurcate the gang allegations was harmless. We conclude the failure to bifurcate the gang allegations was harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

Courts of Appeal have split on the retroactive application of section 1109. At least two courts have held that section 1109 is not retroactive. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 65; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090.) At least two other courts, including this one, have held that section 1109 is retroactive. (*People v. Burgos* (2022) 77 Cal.App.5th 550, 564–569, review granted July 13, 2022, S274743; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1130; but see *Burgos*, at p. 569 (dis. opn. of Elia, J.).) Recently, in *People v. Tran* (2022) ___Cal.5th ___ [2022 Cal. LEXIS 5119] (*Tran*), our Supreme Court declined to resolve this split of authority, concluding that "any asserted error in failing to bifurcate was harmless." (*Id.* at p. ___ [2022 Cal. LEXIS 5119, *55].)

We therefore turn to the question of prejudice. Our Supreme Court has held that, absent a showing that the failure to bifurcate trial of the gang allegations violated defendant's federal constitutional right to due process, error in failing to adhere to the new statutory mandate set forth in section 1109 is subject to review under the standard articulated in *Watson*, *supra*, 46 Cal.2d 818. (*Tran*, *supra*, ___Cal.5th at pp. ___-___

15.

[2022 Cal. LEXIS 5119, *55-*60].)  Applying the *Watson* standard, we conclude it is not reasonably probable defendant would have obtained a more favorable result had the gang allegations been bifurcated.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)  The evidence against defendant was overwhelming.[9]  He confessed to his participation in the offenses and to discharging a firearm within the home.  His confession was corroborated by video surveillance, gunshot residue evidence, and the testimony of the two victims regarding his conduct.  The primary issue at trial was whether defendant acted with intent to kill; his participation in the burglary and robberies was effectively undisputed.  There is therefore no reasonable likelihood bifurcation would have resulted in a different verdict on the robbery and burglary charges, or the associated enhancements for personal use of a firearm (§ 12022.5, subds. (a), (d)).

With regard to the charge of attempted murder and the heavily disputed element of intent to kill, the prosecutor relied primarily on defendant's alleged conduct to argue the means and manner of the shooting indicated an intent to kill.  Specifically, defendant pointed the gun – a .40-caliber semiautomatic firearm, pulled the trigger, and shot at someone at close range in a small room.  We acknowledge the prosecutor also relied on gang evidence to support an inference of intent to kill, arguing:

> "We have two Sure[ñ]o gang members.  Sure[ñ]os are violent individuals. They are a violent organization trained to kill.  They murder people.  They carry weapons.  They are willing to use them."

However, we also note defendant admitted that he participated in the offenses at the direction of higher ranking gang members.  Thus, testimony regarding the gang's "membership, signs, symbols, beliefs and practices, [and] criminal enterprises," as well as indicia of defendant's and Prado-Lopez's gang membership, would have been relevant

---

[9] We do not consider the prejudicial effect of failure to bifurcate on count 11, to which defendant pled guilty prior to trial.

16.

and admissible on the issue of motive.[10] (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; accord, *Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) The jury was properly instructed on the limited purpose of evidence of gang activity. Specifically, the jury was instructed, "You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." Rather, the jury was instructed such evidence could be considered in deciding whether defendant "acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged," and whether defendant "had a motive to commit the crimes charged." We presume the jury followed the court's instructions. (*People v. Homick* (2012) 55 Cal.4th 816, 851.)

Finally, we note that the jury found not true the allegation to count 1 that the attempted murder was premeditated, the allegation on counts 1 through 3 that defendant personally and intentionally discharged the firearm causing great bodily injury, and the allegation on counts 1 and 2 that defendant personally caused great bodily injury. It therefore is apparent the jury did not simply rely on the gang-related evidence to conclude that defendant had committed the charged crimes in the manner described. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.)

In light of the strong evidence of defendant's guilt, the prosecutor's arguments, the court's instructions, and the nature of the verdict, "it is not reasonably probable that a result more favorable to defendant would have been reached" had the gang allegations been bifurcated. (*Watson*, *supra*, 46 Cal.2d at p. 837.) Nor are we persuaded that the failure to bifurcate violated defendant's federal constitutional right to due process, which would require us to determine whether the claimed error was harmless beyond a

---

**10** Some of the gang-related evidence, such as evidence of the predicate offenses, may have been irrelevant to these issues and therefore inadmissible in a bifurcated trial.

reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. Accordingly, any error in failing to bifurcate the allegations was harmless.

## III. SECTION 186.22

Assembly Bill No. 333 also amended the language of section 186.22 to modify the showing necessary to prove gang offenses and gang enhancements. (Stats. 2021, ch. 669, § 3, eff. Jan. 1, 2022.) Defendant contends the prosecution failed to prove a "pattern of criminal gang activity," as defined under section 186.22, as amended by Assembly Bill No. 333. The Attorney General concedes error and suggests the appropriate remedy is reversal of the affected enhancements, and remand to afford the prosecution an opportunity to retry the counts and enhancements to meet its burden of proof. We accept the People's concession. We reverse the gang enhancements to counts 1 through 5 (§ 186.22, subd. (b)) and the firearm enhancements to counts 1 through 3 (§ 12022.53, subds. (d), (e)(1)), and remand for further proceedings, to include a full resentencing.

### A. Applicable Law

Assembly Bill No. 333 amended the language of subdivision (e) of section 186.22, which defines a "pattern of criminal gang activity." Under the former law, a " 'pattern of criminal gang activity' " was established by "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter *and the last of those offenses occurred within three years after a prior offense*, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, former subd. (e), italics added.) However, Assembly Bill No. 333 redefines " 'pattern of criminal gang activity' " to require "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense *and within three years of the*

18.

*date the current offense is alleged to have been committed*, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational." (§ 186.22, subd. (e)(1), italics added.)  Furthermore, "[u]nder the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses." (*People v. Ramos*, *supra*, 77 Cal.App.5th at pp. 1125-1126; accord, § 186.22, subd. (e)(2).)

Subdivision (f) of section 186.22 formerly defined a " 'criminal street gang,' " in relevant part, as "any ongoing organization, association, or group of three or more persons . . . *whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity.*" (§ 186.22, former subd. (f), italics added.)  Assembly Bill No. 333 amended this definition to include only "an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.)  Additionally, Assembly Bill No. 333 added a new subdivision to section 186.22, which provides:  "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational.  Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

"[A]bsent evidence to the contrary, [we presume] the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date.  [Citations.]  This principle also applies when an enhancement has been amended to redefine to an appellant's benefit the conduct subject to the enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344.)  Additionally, " '[a] defendant is entitled to the benefit of an

19.

amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending case[s].' " (*Ibid.*) "Assembly Bill [No.] 333 increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement." (*Ibid.*) Accordingly, we agree with defendant and the Attorney General that defendant is entitled to the benefit of this change in law.

### B. Analysis

On counts 1 through 5, the jury found gang enhancements to be true. (§ 186.22, subd. (b)(1)(C).) Additionally, on counts 1 through 3, the jury found true firearm enhancements pursuant to section 12022.53, subdivisions (d) and (e)(1), which require proof that defendant violated subdivision (b) of section 186.22. (§ 12022.53, subd. (e)(1)(A).)

The jury was not instructed on the new requirements of Assembly Bill No. 333. Instead, the jury was instructed it could rely on crimes committed within three years of each other to establish a pattern of criminal gang activity. The jury also was instructed such crimes need not be gang related and the crimes charged in the instant case could, if proved, be considered in deciding whether a pattern of criminal gang activity also had been proved. The instructions did not require the jury to find that the predicate offenses commonly benefited the gang or that such benefit was more than reputational.

Furthermore, as the People concede, the trial evidence does not satisfy the new requirements of Assembly Bill No. 333. The prosecution's gang expert testified to two predicate offenses to show a pattern of criminal gang activity, which were committed in January 2013 and January 2011, respectively. Neither offense was committed within three years of the date of the currently charged offenses, i.e., February 23, 2017. (See § 186.22, subd. (e)(1).) Additionally, no evidence was offered to establish the predicate offenses commonly benefited the gang in a way that was more than reputational. (*Ibid.*)

20.

Moreover, although the gang expert testified the instant offenses benefited the gang in various ways, some of those benefits were merely reputational.  (See § 186.22, subd. (g).)

Based on the foregoing, we must reverse the true findings on the gang enhancements to counts 1 through 5, and the true findings on the firearm enhancements to counts 1 through 3.  The matter will be remanded to give the People the opportunity to prove the offenses and the applicability of the enhancements under the amendments to section 186.22, if they choose.  (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.)  In light of these reversals, we vacate the sentence in its entirety and remand the matter for further proceedings on the reversed counts and allegations, if any, and for a full resentencing.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; see also *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

This disposition renders moot defendant's claim that the original sentence violates the California Constitution's prohibition against cruel and unusual punishment and his claim that resentencing is required under Senate Bill No. 567 and its amendments to section 1170, subdivision (b).

## DISPOSITION

The true findings on the gang enhancements (§ 186.22, subd. (b)(1)(C)) to counts 1 through 5, and the gang-related firearm enhancements (§ 12022.53, subds. (d), (e)(1)) to counts 1 through 3 are reversed.  Sentence is vacated in its entirety and the matter is remanded for further proceedings and/or resentencing in accordance with this opinion.

In all other respects, the judgment is affirmed.


                                                          DETJEN, J.
WE CONCUR:


HILL, P. J.


PEÑA, J.